## WALLING, WAGE AND HOUR ADMINISTRATOR, *v.* GENERAL INDUSTRIES CO.

No. 564.   Argued February 10, 11, 1947.—Decided March 31, 1947.

*George M. Szabad* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Washington, Philip Elman, William S. Tyson, Bessie Margolin* and *Morton Liftin.*

*Glen O. Smith* argued the cause for respondent. With him on the brief were *M. Reese Dill* and *Carl F. Shuler.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

In a complaint filed in the District Court, petitioner charged that respondent was violating the Fair Labor Standards Act [1] by failing to pay some of its employees time and one-half for statutory overtime, as required by § 7 (a) of the Act, and asked an injunction against continued violation. Respondent denied the charge, and separately alleged that any of its employees not compensated in accordance with the requirements of § 7 (a) were exempt from the Act by § 13 (a).

The Court, without a jury, heard witnesses for both parties with respect to the compensation and status of three engineers in respondent's power plant. It made special findings of fact, concluded that these men were

---

[1] 52 Stat. 1060, 29 U. S. C. § 201 *et seq.*

exempt employees, and entered judgment for respondent.[2] The Circuit Court of Appeals thought the evidence did not sustain the District Court's findings relative to the engineers' exempt status. But it thought that the District Court had also found the engineers' compensation to be in accordance with the Act. It decided that the evidence was adequate to this end, and affirmed the District Court's judgment.[3] We granted certiorari[4] to determine whether the ruling of the Circuit Court of Appeals was not inconsistent with this Court's decision on computation of overtime in *Overnight Motor Co.* v. *Missel*, 316 U. S. 572. On argument here, however, respondent continued to urge that the District Court was warranted in its findings as to the engineers' exempt status.[5] Having heard the argument and examined the record, we agree that it was. Therefore, we need not consider further the question of computation of overtime, and proceed only to state the considerations relevant to the particular ground of our decision.

There is no dispute as to the applicable law. Section 13 (a) exempts from the overtime provisions of the Act any person employed in an "executive capacity" as defined in regulations issued by the Administrator. The Regulations prescribe six conjunctive conditions to an executive capacity, which are set forth in the margin.[6] Respondent

---

[2] *Walling* v. *General Industries Co.*, 60 F. Supp. 549.

[3] *Walling* v. *General Industries Co.*, 155 F. 2d 711.

[4] 329 U. S. 704.

[5] Respondent was entitled to make this contention here without filing a cross-petition for certiorari. *Langnes* v. *Green*, 282 U. S. 531, 538; *Public Service Commission of Puerto Rico* v. *Havemeyer*, 296 U. S. 506, 509.

[6] 29 C. F. R. Cum. Supp. § 541.1, 5 Fed. Reg. 4077 (Regulations of the Administrator, Wage and Hour Division, U. S. Dept. of Labor, Oct. 24, 1940, amended Jan. 16, 1942) provides as follows:

"§ 541.1 *Executive.*

"The term 'employee employed in a bona fide executive . . .

had the burden of proving the existence of these conditions, if it would rely on its defense that the engineers were exempt employees.[7]

There was evidence to the following effect. Respondent operates at Elyria, Ohio, a plant engaged in the production of small motors and plastic products. Part of this plant consists of a powerhouse containing a boiler room and engine room. In the former are four boilers. These supply the steam required to drive three large electrical generators which are the source of power for the entire plant, and to create the high steam-pressures and air-pressures employed in molding plastics. In the engine room, besides the generators, are compressors, engines, and other equipment. All this machinery, in both rooms, constitutes an interrelated and interdependent system. It must be carefully and skillfully tended at all times in order to

capacity' in section 13 (a) (1) of the Act shall mean any employee

"(a) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

"(b) who customarily and regularly directs the work of other employees therein, and

"(c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

"(d) who customarily and regularly exercises discretionary powers, and

"(e) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

"(f) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction; provided that this subsection (f) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment."

[7] See *Helliwell* v. *Haberman*, 140 F. 2d 833, 834 (C. C. A. 2); *Fletcher* v. *Grinnell Brothers*, 150 F. 2d 337, 340–341 (C. C. A. 6); *Smith* v. *Porter*, 143 F. 2d 292, 294 (C. C. A. 8).

maintain the power and pressure required for continuous 24-hour operation of the plant, to avoid damage to the tremendous investment in the machinery itself, and to guard against the fearful consequences of an explosion.

During the period covered by the evidence, the powerhouse was manned by the following personnel. At the top was the chief engineer, who apparently adhered to no precise duty-hours, but was customarily present most of the morning and afternoon and subject to call, in the event of an emergency, twenty-four hours a day. Directly under and responsible to him were the three "operating engineers" whose status is in issue. They worked consecutive eight or eight and one-half hour shifts, one of them being present in the powerhouse at all times. Finally, there were an unspecified number of firemen and coal-passers, who, collectively, were also on twenty-four hour duty.

The engineers in question were paid regular monthly salaries of more than $200 per month, for which they regularly worked six-shift weeks. They received sick leave, vacations with pay, bonuses, insurance, and pension rights usually reserved for supervisory employees.

The engineers were in charge of the powerhouse and performed the duties generally incident to direct supervision of a highly mechanized operation. Respondent's vice president and factory manager testified that they acted as foremen of the firemen and coal-passers. This testimony was corroborated by other facts. In July, 1944, two months before the complaint in this case was filed, the engineers signed agreements with respondent stating their desire "to be regarded as Foremen, as in the past, with Foremen privileges and continue on a salary basis." Three weeks later the International Brotherhood of Firemen, Oilers and Helpers abandoned a long-contested claim of right to represent the engineers, thereby formally recognizing their supervisory status. Indeed, the nature of the operations in the powerhouse

was such that the immediate and continuous supervision of trained persons was indispensable, and there were concededly no other employees to give such supervision. The engineers were required to maintain constant observation of all machinery in the powerhouse, and to make regular inspections and necessary repairs. In addition they were required to spend a small part of their time in oiling and cleaning the engines.

The District Court, having made findings substantially as stated above, proceeded to make additional findings of the existence of each of the facts on which an executive status, as defined by the Regulations, is made to depend.

We believe that the evidentiary facts afford an adequate basis for the inferences drawn by the Court in making such additional findings. At the least, we think that in drawing such inferences the Court was not clearly wrong, and conclude that the findings should therefore have been left undisturbed.[8] The Circuit Court of Appeals' rejection of those findings cannot rest on the conflicting testimony of petitioner's witnesses. The District Court heard the witnesses, and was the proper judge of their credibility.[9]

*Affirmed.*

MR. JUSTICE RUTLEDGE, dissenting.

In my opinion the Circuit Court of Appeals correctly found that the evidence is not sufficient to sustain the findings upon which the District Court concluded that

---

[8] Rule 52 (a), Federal Rules of Civil Procedure; *Lawson* v. *United States Mining Co.*, 207 U. S. 1, 12; *Butte & Superior Copper Co.* v. *Clark-Montana Realty Co.*, 249 U. S. 12, 30. See *District of Columbia* v. *Pace*, 320 U. S. 698, 701.

[9] Rule 52 (a), Federal Rules of Civil Procedure; *Adamson* v. *Gilliland*, 242 U. S. 350; *United States* v. *United Shoe Machinery Co.*, 247 U. S. 32, 37, 38, 41.

the operating engineers are exempt under § 13 (a) (1) of the Fair Labor Standards Act. It said, unanimously:

"The District Court found as a fact that Stegman, Page and Spooner were employed as foremen or supervisors of the department, with power to supervise the work of firemen and coal-passers in the boiler-room; that they customarily and regularly directed the work of other employees in the department, and customarily exercised discretionary powers. We think these findings are not sustained by the evidence. The work done by the engineers was highly skilled mechanical work. While the machinery was vital to the plant, dangerous and complicated, its operation involved no exercise of discretion, but merely the proper application of the skilled engineering training which these men had received. Although the three engineers were responsible for the proper operation of the machinery during their shifts, and, as the factory manager testifies, 'in charge of management of the property,' none of them could fire or hire or give orders to any man in the boiler-room. Latteman, the chief engineer, who was present at the plant during one shift and on call 24 hours a day and seven days a week, was in full charge of the department. While Latteman might act on information from Stegman, Page, or Spooner, during the period involved, orders emanated only from him. It is not shown that Stegman, Page or Spooner ever made any recommendation concerning the change in status of the boiler-men. It was essential to have proper steam pressure in the boiler-room, but if the three engineers desired in this connection to secure action from the firemen and coal-passers, they had to secure an order from Latteman. This evidence is not contradicted." 155 F. 2d 711, 714.

An independent examination of the record confirms the Court of Appeals' conclusions. It discloses that on one or two occasions an operating engineer tried to give orders to firemen or coal passers in the boiler room, but in each instance those men refused to follow them and took their orders solely from Latteman. This falls far short at least of the regular and customary supervision required by §§ 541.1 (a) and (b) of the controlling regulations to make the exemption operative.

Since the Court does not reach other questions presented on the record, I express no opinion concerning them.

MR. JUSTICE BLACK and MR. JUSTICE MURPHY join in this dissent.