**BARIE v. SUPERIOR TANNING CO.**
No. 9938.

United States Court of Appeals
Seventh Circuit.
June 16, 1950.

Charles H. Howson, Charles H. Howson, Jr., Philadelphia, Pa., Edward C. Grelle, Chicago, Illinois, Brown, Jackson, Boettcher & Dienner, Chicago, Illinois, Howson & Howson, Philadelphia, Pa., for defendant-appellee.

Before KERNER, DUFFY and FINNEGAN, Circuit Judges.

DUFFY, Circuit Judge.

This is a suit involving the validity and the alleged infringement of Claims 3 and 4 of Patent No. 1,751,464 issued to Walter A. Beck on March 25, 1930, on an application filed July 2, 1923, and Claims 2, 3 and 4 of Patent No. 2,102,667 issued to George M. Argabrite on December 21, 1937, on an application filed November 19, 1936. Both patents relate to processes for stretching and drying leather while in the process of tanning.

Superior Tanning Company is an Illinois corporation with place of business in Chicago. It is the owner of a machine which allegedly infringes the process claims of the patents in suit as hereinbefore described. Proctor and Schwartz Company of Philadelphia sold the machine to defendant, and is on record as defending this suit.

The district court adjudged both the Beck and Argabrite patents invalid, but made no findings with respect to the defense of non-infringement of Beck, or the defense of prior public use of Argabrite, or the defense of misuse as to both patents. Defendant pleaded that plaintiff was without right to relief on the ground it was misusing the patents by attempting to extend the monopoly thereof to unpatented structures not within the grants.

Prior to 1914 when Schmidt Patent No. 1,118,813 was issued, it had been the practice when stretching and drying a hide to lay it on a flat board or frame of sufficient size and tack the edges of the hide to the board or frame. Another system called toggling consisted of fastening metal clips to the edges of the hide at spaced intervals and hooking the clips to a perforated plate.

Schmidt Patent No. 1,118,813, issued November 24, 1914, disclosed the idea of past-

John M. Kisselle, Robert A. Choate, Detroit, Mich., Edwin S. Booth, Chicago, Illinois, Dawson, Ooms, Booth & Spangenberg, Chicago, Illinois, Barnes, Kisselle, Laughlin & Raisch, Detroit, Michigan, for plaintiff-appellant.

ing the hide to a board or other flat surface. A film of adhesive was placed either on the hide or on the flat surface, and the exposed surface of the hide was worked, either by the operator's hand or by the application of a glass or metal tool, gradually working toward the edge portions. While the hide was wet and plastic, the thick portions of the hide could be stretched or rolled out and the thick and thin portions of the hide worked together for uniformity. This method avoided the holes and uneven edges caused by holding means such as toggle clips and tacks. The Schmidt pasting process was put into practice commercially in the Schmidt tannery where Walter E. Beck, the patentee in No. 1,751,464, was employed.

Beck acknowledged in his patent that it was not new to paste wet skins to a flat surface. Beck states in his patent that the drying boards to which the hide has been pasted should be placed horizontally on a supporting table, and that the operator by use of a suitable tool works the skins from the center to the periphery to eliminate the surplus adhesive and to stretch out the thick portions of the hide. When a skin has been "set out" on one side of a drying board, the board is turned over, preferably by use of a reversing frame, and a second skin is set out on the reverse side of the board. Such board is then engaged with an automatic conveyer having depending hooks on which the boards may be suspended.

The Beck disclosure shows the speed of the conveyer and the spacing of the hooks are such that the drying boards are taken rapidly away from the loading station. During the drying process, however, it is desirable that the boards be spaced closely together to economize on space occupied, and the patent shows the drying boards

with the skins pasted thereon are transferred from the faster moving conveyer to a slower moving conveyer which carries the boards through a drying chamber.

Before the slower moving conveyer carries the drying boards the entire length of the drying chamber, the skins are thoroughly dry and may be stripped off the boards by workmen. The boards minus the skins are then transferred to the faster moving conveyer. Washing and scrubbing of the boards is required to remove the dried adhesive left on the boards. According to Beck such boards are then removed bodily from the conveyer and placed in a washing and scrubbing machine having a series of water jets and revolving brushes, which are directed to both the upper and lower faces of the boards. When a board has been cleaned, it is laid horizontally on a table and a fresh skin is pasted thereon, and the hereinbefore described process repeated.

Plaintiff claims the Beck disclosure shows the idea of mounting a series of pasting boards in an orbit in which a portion of the boards is in closely spaced parallel relation and advancing at a low rate of speed for drying, and that in another portion of the orbit the boards are more widely spaced and advancing at a higher rate of speed. The boards are manually removed from the orbit at this wider spaced portion for the purpose of cleaning them, and thereafter again pasting skins thereon. Claim 4 of the Beck patent is typical and appears in the footnote.[1] The pasting boards used by Beck each weighed about five pounds.

In the Argabrite process heavy boards were used which were suspended vertically at all times on a closed track. The boards were carried single file, end to end relation,

1. Claim 4 of Beck Patent No. 1,751,464 reads: "In a process for manufacturing leather, the advancement of a series of mounting boards through an orbit including a portion in which the boards are in closely spaced parallel relation and slowly advancing, and a portion in which said boards are more widely spaced and advancing at a higher rate of speed, removing and replacing said boards in the widely spaced portion of the orbit, washing and scrubbing the opposite surfaces of said boards after removal from the orbit, mounting an adhesive coated skin on one side of the scrubbed board, mounting of a separate adhesive coated skin on the opposite sides (sic) of said board and the stripping of the dried skin from said boards while advancing through the closely spaced portion of the orbit."

through a washing station and a pasting station and then to a switching point where the track became double and carried the boards in parallel closely spaced relation through a forced air drying chamber.

The district court found that Claims 3 and 4 of the Beck patent do not set forth a patentable invention over the prior art as revealed in the Schmidt patent, and the process practiced thereunder, and also the prior patents to Fernow (No. 237,969) and Ayres (No. 1,464,348) and other patents. He also found that Claims 2 to 6 inclusive of the Argabrite patent in suit do not set forth a patentable invention over the prior art as revealed in the vertical pasting loft drying process used by Endicott-Johnson Corporation, the Beck patent in suit (No. 1,751,464), and the patents to Morshead (No. 1,620,120) and Ohlson (No. 2,067,981), and other patents.

Plaintiff stresses that in its opinion the trial court quoted from Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58, and included the portion containing the unfortunate "flash of creative genius" phrase. This court has twice specifically rejected the flash of genius test. Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 7 Cir., 132 F.2d 812; Falkenberg v. Bernard Edward Co., 7 Cir., 175 F.2d 427. The Supreme Court has not repeated the much criticized phrase, or otherwise signified that it meant approving such a doctrine as a new test for patentability. The trial court in the case at bar did not particularly emphasize the phrase, except that it was included in a quotation by the court. We shall, therefore, consider that the trial court applied the correct traditional test, that is: Did the claimed inventions in the patents in suit involve more than the skill or ingenuity that would be shown by a workman skilled in his line of work?

The findings of the trial court of lack of patentable invention are findings of fact which are covered by Rule 52 (a), Federal Rules of Civil Procedure, 28 U.S.

C.A. Falkenberg v. Bernard Edward Co., supra; Graver Tank & Mfg. Co., Inc., et al. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672. We think such findings are sustained by substantial credible evidence. As to the Beck patent, the pasting, drying, stripping and washing steps were old in the Schmidt process. All Beck did was to mechanize the Schmidt process by utilizing a conveyer system already in use elsewhere. In adopting a conveyer to carry boards bearing skins to a drying chamber or tunnel through which heated air was circulated, Beck merely followed Ayres, for Ayres Patent No. 1,464,-348 discloses an apparatus for drying skins wherein the skins are conveyed in parallel planes through a drying chamber in which the skins are subjected to a forced drying action. In suspending boards on a conveyer so that they could be carried through a drying chamber in closely spaced parallel relation, Beck again followed a practice in use as stated in Ayres.[2] In adopting two conveyers moving at different speeds, Beck did what any other skilled mechanic might have done. The speed of the boards traveling through the drying chamber was necessarily dictated by the time required for drying the skins. Furthermore, Fernow 237,-969 showed both a slowly moving conveyer and a faster moving conveyer for advancing the series of articles through a drying chamber. According to Fernow the first conveyer traveled at one-third the speed of the second conveyer, and carriages were spaced on the slowly moving conveyer at spaces one-third of those on the faster moving conveyer.

The record does not reveal any efforts previous to Beck to mechanize the Schmidt pasting process, or that such efforts, if any, failed. We agree with the trial court that facts indicating invention, as distinguished from expected mechanical skill, are entirely lacking as to Claims 3 and 4 of Beck Patent No. 1,751,464.

Plaintiff originally brought suit herein on Claims 2 to 6 of Argabrite Patent No.

---

2. The Ayres patent states: "In apparatus for drying skins, the common practice has been to provide a comparatively long chamber in which heated air is circulated and to suspend the skins from an overhead conveyer, the plane of skins being at right angles to the line of travel of the conveyer."

2,102,667. However, neither Claim 5 nor Claim 6 contains any reference to a closed circuit and called only for suspending the plate in a vertical plane. Plaintiff now concedes that Claims 5 and 6 read on the vertical pasting loft drying process used by Endicott-Johnson more than two years prior to the filing of the Argabrite patent. We, therefore, only consider Claims, 2, 3 and 4 of Argabrite.

The leather drying process of Argabrite is substantially the same as in Beck, except that in Argabrite the boards or plates on which the hides are pasted are not removed from the closed track circuit. The boards remain in a vertical position suspended from the conveyer during the whole operation of washing, pasting and stripping.

The trial court cited prior art against Argabrite. In 1929 a process of drying leather was installed at the plant of Endicott-Johnson, Endicott, New York. "I" beams ran the length of the drying room or loft. From these beams drying boards were suspended and hides were pasted on both sides thereof as they hung vertically from the "I" beams. The boards were pushed along the beams, with a space allowed between each board, and were left in the drying room overnight during which time hot air was forced from a ceiling duct downward between the boards by means of fans. The boards were suspended from the beams at all times, and all pasting, stripping and washing was done with the boards in a vertical position.

Application for Ohlson Patent No. 2,067,-981 was filed on November 2, 1933, more than a year prior to the Argabrite application. Ohlson is a patent on a cross-over switch for switching trolley wheels which travel on overhead conveyer tracks of leather stretching and drying systems. The system was so constructed that frames carrying the hides while in the drying chamber are in closely spaced parallel relationship, but when they get outside the drying chamber they travel on the outside system end to end. Morshead Patent No. 1,620,120 is for a hosiery drying machine by which stockings are carried on rigid forms which move through a drying chamber in closely spaced and substantially parallel relation, but when the forms come to the exposed track they travel end to end. The drying forms or boards are at all times retained in a vertical position.

We think the trial court was correct in finding lack of invention as to Claims 2, 3 and 4 of Argabrite on the prior art of Ohlson, Morshead and the Endicott-Johnson vertical pasting loft drying process. However, a strong additional reason for denying relief to plaintiff is the validity of the defense of prior public use.

Plaintiff insists that defendant may not here rely upon the pleaded defense of prior public use because the district court did not make a specific finding thereon. This contention is without merit. In an appellate court the appellee may rely upon grounds for supporting the judgment below even though they were rejected or not passed upon by the trial court. Walling v. Consumers Co., 7 Cir., 149 F.2d 626; Topping v. Fry et al., 7 Cir., 147 F.2d 715; R. E. Crummer & Co. v. Nuveen, et al., 7 Cir., 147 F.2d 3, 157 A.L.R. 739. A judgment which is correct must be affirmed even though the trial court relied upon the wrong ground. Reconstruction Finance Corp. v. Goldberg, 7 Cir., 143 F.2d 752. See also: Helvering v. Lerner Stores Co., 314 U.S. 463, 464, 62 S.Ct. 341, 86 L.Ed. 343; Langnes v. Green, 282 U.S. 531, 538-539, 51 S. Ct. 243, 75 L.Ed. 520; Walling v. General Industries Co., 330 U.S. 545, 67 S.Ct. 883, 91 L.Ed. 1088; McGoldrick v. Compagnie Generale, 309 U.S. 430, 434, 60 S.Ct. 670, 84 L.Ed. 849.

On October 24, 1934, a pasted leather drying machine, which was designed to and did perform precisely the process claimed in the Argabrite patent, was installed and placed in operation at the plant of Endicott-Johnson. The machine was purchased from Special Equipment Company of Chicago, of which George M. Argabrite, patentee in No. 2,102,667, was then president. The unit has not been changed in any material respect since first installed, and it is still in operation.

The Endicott-Johnson unit operated during the period from October 24, 1934, to November 19, 1934, all of which period was

more than two years before the Argabrite filing date of November 19, 1936. During that particular period an average of 650 skins per day was dried, all of which went into the Endicott-Johnson regular commercial production.

Plaintiff seeks to avoid the consequences of the public use heretofore described by claiming that certain pulleys and other parts of the machine had to be replaced, and that therefore the operation of the machine prior to November 19, 1934, should be considered as experimental. However, the machine worked practically daily, on an eight-hour shift, during the period from installation to November 19, as is shown by the processing of an average of 650 skins per day. As the skins were used in the regular commercial production of Endicott-Johnson, the use of the machine to dry the skins must be considered as a public use and this is fatal to the claim by plaintiff under the Argabrite patent.

The judgment is

Affirmed.