Vincent C. TUMMINELLO, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 463–87C.

United States Claims Court.

April 25, 1988.

Joseph F. Henderson, Washington, D.C., for plaintiffs.

Paul J. Ehlenbach, with whom were Asst. Atty. Gen. John R. Bolton, David M. Cohen, and Robert A. Reutershan, Washington, D.C., for defendant.

## ORDER

BRUGGINK, Judge.

Pending before the court in this action brought pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207, 216 (1982 & Supp. III 1985), is Defendant's Motion To Dismiss or, In the Alternative, To Strike Certain Parties/Request for Imposition of Sanctions, filed November 27, 1987. The motion is based on plaintiffs' asserted failure to follow the requirements of RUSCC 11, 20, and 21 in the filing of the complaint, as amended, and the written consents of certain employees. In relevant part, RUSCC 20 and 21 prevent joinder of parties to an ongoing multiple-party action.

The original complaint was filed on August 6, 1987. There were three named plaintiffs: Vincent Tumminello, Edward Baldwin, and John Garrett. All were alleged to be employees of the Social Security Administration ("SSA") who had not received overtime compensation in violation of the FLSA. In addition, the complaint purported to be filed on behalf of certain unnamed Government employees who had given their written consent to be parties in the action. The consents were not attached.

On September 11, 1987, an amended complaint was filed. Because the complaint was amended before an answer was filed, amendment was of right. RUSCC 15(a).[1] It added two additional named plaintiffs, Arthur Blunt, a GS-11 Industrial Specialist at the Defense Logistics Agency, and Gary Love, a GS-11 Electronics Technician at the Defense Mapping Agency.

On November 6, 1987, plaintiffs filed a Notice Of Filing Plaintiffs' Consent. It was a list of names, and in some instances social security numbers, of 3732 individuals —the five named plaintiffs and 3727 others. Copies of consent forms to support the list were also submitted.

On November 27, 1987, defendant filed its motion. After briefing, oral argument, and an opportunity to address additional matters raised at oral argument, the matter is ready for resolution. Much of the court's analysis with respect to RUSCC 20 and 21 will be omitted here; it is set out in full in the decision contemporaneously being issued in *Canfield, et al. v. United States*, 14 Cl.Ct. 687 (1988). For the reasons expressed in *Canfield*, as further explained here, defendant's motion based on RUSCC 20 and 21 is well taken. Unlike *Canfield*, however, special circumstances, and consideration of RUSCC 11, call for a somewhat different remedy.

In *Canfield*, the court ruled: "In light of RUSCC 20 and 21, there are three ways

---

**1.** The extent to which RUSCC 20(a) ("No such multiple-party complaint may be amended by any such party by adding any new party plaintiff.") overrides RUSCC 15(a) ("A party may amend his pleadings once as a matter of course before a response is served....") is discussed below. *See infra* note 6.

individuals may be added to an existing action under FLSA section 7 in this court: (1) by filing a separate complaint naming all the parties in alphabetical order in the caption, and seeking consolidation under RUSCC 42; (2) by a motion to intervene pursuant to RUSCC 24; or (3) by a motion for waiver of the prohibition in RUSCC 20 and 21 against joinder by amendment of multiple-party complaints, demonstrating the particular circumstances justifying such a waiver." 14 Cl.Ct. at 690. The court held that a waiver of RUSCC 20 and 21 was justified given the specific circumstances of the case. In this action, however, the court concludes that the written consents should be rejected, that waiver of the court's rules is inappropriate as to the 3727 individuals named in the November 6, 1987 filing,[2] and that any of these employees attempting to press a claim must do so by filing a new action or actions, or by seeking to intervene pursuant to RUSCC 24(b). In addition, the court drops Arthur Blunt as a party to this action, and severs the claims of Gary Love.

## DISCUSSION

### A. Severance of Claims

FLSA section 16(b) provides in part:

Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.... An action to recover the liability prescribed in ... the preceding sentence[ ] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction *by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing* to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (emphasis added). Although it was not fully clear until oral argument, plaintiffs fall into three separate classes of "related FLSA claims presented by different representative plaintiffs." Class 1 includes SSA Claims Representatives at the GS–9 level and above who contend that they are improperly classified as exempt from FLSA overtime compensation. They allege that they perform the same work as nonexempt GS–5 and GS–7 employees, and thus should also be classified as nonexempt. Plaintiffs Tumminello, Baldwin, and Garrett represent this class. Class 2, represented by plaintiff Gary Love, includes all federal employees who allegedly "suffered FLSA losses by virtue of the OPM [Office of Personnel Management] regulations declared invalid" in *American Federation of Government Employees, AFL–CIO v. OPM,* 821 F.2d 761 (D.C.Cir.1987) ("*AFGE*"). The regulations struck down by the court had established a rebuttable presumption that GS–11 and above employees were exempt from FLSA overtime compensation. 5 C.F.R. § 551.203 (1986). The individuals in Class 2 allegedly lost their nonexempt status as a result of these invalid regulations.[3] Class 3, represented by plaintiff Arthur Blunt,

---

**2.** As in *Canfield,* the court treats the notice of consent filing as, in effect, a request for a waiver of the prohibition in RUSCC 20 and 21 against amendment of multiple-party complaints. In the case at bar, however, waiver is not appropriate.

**3.** Plaintiffs recite that the SSA employees included in Class 1 could also assert this claim: "If they prevail on their challenge to the exempt status determination, they would further challenge the defense that they were nonetheless exempt by virtue of the OPM regulations...." Plaintiffs' Brief of Dec. 24, 1987, at 12. While it

is premature to address the merits of plaintiffs' claim, the court notes that this defense has not yet been raised. Given the fact that the OPM presumption regulations have been declared invalid, and the fact that the three SSA plaintiffs were apparently exempt before the enactment of the OPM regulations, it is unlikely that such a defense would be raised. Moreover, if plaintiffs in Class 1 prevail on their claim that SSA Claims Representatives at the GS–9 level and above have been improperly treated as exempt, a further challenge to the defense asserted above would seem superfluous.

includes all FLSA nonexempt employees who received overtime compensation at the lesser "capped" premium rate provided in 5 U.S.C. § 5542 (capped at one and one-half times the minimum GS–10 rate). *See infra* note 8.

■ An action under FLSA section 16(b) can only be maintained by employees "similarly situated" to the named plaintiffs. *See Riojas v. Seal Produce, Inc.*, 82 F.R.D. 613, 616 (S.D.Tex.1979); *Burgett v. Cudahy Co.*, 361 F.Supp. 617, 622 (D.Kan. 1973); *Shain v. Armour & Co.*, 40 F.Supp. 488, 490 (W.D.Ky.1941).[4] The named plaintiffs must, consequently, be similarly situated to each other. *See Aguirre v. Bustos*, 89 F.R.D. 645, 647 (D.N.M.1981). The only apparent similarities between the three named SSA plaintiffs and Gary Love, however, are that all four are federal government employees with possible FLSA claims. The specific claims of employees within Class 1—that they are improperly classified as exempt from FLSA overtime compensation—would require very different proof than that required by Class 2

claims; the employees within Class 2 would, at a minimum, need to prove that their status was changed from nonexempt to exempt as a result of the OPM regulations declared invalid in *AFGE*, thus entitling them to back overtime compensation. In addition, Class 1 includes only SSA Claims Representatives. Class 2 admittedly includes job classifications in "virtually every federal agency." Transcript at 11.[5] Consequently, the court concludes that it is appropriate to sever Gary Love's claims from this action.[6]

■ Furthermore, the court orders that the class represented by Love shall be limited to employees within the Defense Mapping Agency of similar grade (GS–11) and job category (Electronics Technician)—i.e., "employees engaged in the same character of work"—who claim that they were classified exempt solely as a result of the invalid OPM regulations. As currently constituted, the class represented by Love includes employees in many different federal agen-

---

4. In *Shain*, the court set forth a general description of "similarly situated" employees:

> It is of course true ... that many differences exist between the plaintiff and other employees of the defendant even though engaged in the same type of work, such differences being as to the time worked, wages actually due, and hours of overtime involved. But such differences merely mean that their positions and claims are not identical; it does not follow that they are not similar. Employees may be similarly situated without being identically situated. The evident purpose of the Act is to provide one law suit in which the claims of different employees, different in amount but *all arising out of the same character of employment*, can be presented and adjudicated, regardless of the fact that they are separate and independent of each other. In such instances, where liability is denied by the employer, there are certain questions of both law and fact which are common to all employees engaged in the same character of work.... It is in accordance with sound public policy to provide for the determination of such common questions, depending as to each employee upon the same identical facts, in one litigation instead of many independent suits.

40 F.Supp. at 490 (emphasis added).

5. At oral argument, the court asked counsel: How many different job classifications are we talking about?

MR. HENDERSON: It is unknown to us, Your Honor. It would reach virtually every federal agency. There would probably be a handful of jobs in virtually every employing agency that was affected by those invalid regulations.

6. As to the propriety of the September 11, 1987 amended complaint that added Love and Blunt as named plaintiffs, the court concludes that RUSCC 15(a) overrides the prohibition against amendment of multiple-party complaints. On a related issue, the district courts are divided as to whether Federal Rule of Civil Procedure ("FRCP") 15(a) takes precedence over the requirement in FRCP 21 for a party to obtain leave of court when dropping or adding parties. *See* 3 J. Moore, *Moore's Federal Practice* ¶ 15.07[3] (2d ed. 1985); *McLellan v. Mississippi Power & Light Co.*, 526 F.2d 870, 872 & n. 3 (5th Cir.1976), *vacated in part on other grounds*, 545 F.2d 919 (5th Cir.1977). Neither the Federal Circuit nor the Court of Claims has ever addressed this issue. The court finds persuasive the reasoning of the Fifth Circuit in *McLellan*, 526 F.2d at 872–73, and concludes that the amendment adding plaintiffs Love and Blunt was of right; defendant conceded this point at oral argument. RUSCC 20 and 21 would apply only after the Government's answer was filed or after plaintiff filed one amendment as of right.

cies and in various job categories. The determination of whether an exemption applies to a given individual, however, is a very fact-specific exercise. *See, e.g., Walling v. General Indus. Co.,* 155 F.2d 711, 713 (6th Cir.1946), *aff'd,* 330 U.S. 545, 67 S.Ct. 883, 91 L.Ed. 1088 (1947); *Cervino v. Matthews,* No. 76-1384 (E.D.Pa. July 13, 1978) (bench opinion by Becker, J.); *Phillips v. Federal Cartridge Corp.,* 69 F.Supp. 522, 524 (D.Minn.1947) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)); *Wright v. United States Rubber Co.,* 69 F.Supp. 621, 623 (S.D.Iowa 1946). This court has held that even persons sharing the same job series and title may not necessarily both be exempt or nonexempt. *See Sabey v. United States,* 6 Cl.Ct. 36 (1984). The individuals represented by Gary Love may be properly exempt under other provisions of the FLSA, notwithstanding the invalid OPM regulations. For example, FLSA section 13(a)(1) exempts from overtime coverage "any employee employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1), thus necessitating an employee-specific, or at least job-specific, inquiry.

If the individuals currently represented by Gary Love[7] can be said to be similarly situated, and if consent filings can continually be added to this one lawsuit (or the severed action), the court is instantly transformed into a permanent open forum for reviewing all future FLSA claims arising from the *AFGE* decision. Although common questions of law might apply to these individuals, the factual distinctions between employees in different job categories and in different federal agencies precludes a finding that they are all similarly situated to Gary Love. For these reasons, the court

severs the claims of Gary Love and limits the class he may represent.

Plaintiffs originally alleged that Class 3 was represented by named plaintiff Arthur Blunt. They now concede, however, that Blunt is an inappropriate representative and that his claim should never have been filed. Accordingly, the court strikes Blunt as a party to this action. In addition, the following discussion that occurred at oral argument demonstrates that Class 3 is not a distinct group of individuals with similar claims, but rather relates to damages insofar as liability is first established in favor of Classes 1 and 2:

> MR. HENDERSON: Well, the third really is not a distinct group. In any event, it is subsumed into whether or not the Government concedes back pay liability for the denial of nonexempt status....
>
> But essentially the third group would be—the argument of the third group is that in the event Plaintiffs prevail on the first two groups of back pay entitlement, that the wages that they would be looking at would be the difference between their capped Title V overtime and their full time and a half, FLSA overtime.
>
> THE COURT: Okay, the capping question. And that would apply to both categories?
>
> MR. HENDERSON: That's correct, to the extent that there's a dispute on the application.

Thus, the fact that Blunt has been dropped from the action does not prevent the proper Class 1 or Class 2 (now severed) plaintiffs from asserting the claim regarding improper capping of overtime compensation.[8]

---

7. As discussed below, the court cannot determine which individuals who filed written consents are represented by Gary Love (Class 2). Plaintiffs have not provided the court with any mechanism to distinguish between the various classes of claims encompassed by the 3727 consents. The lack of information supplied by the consents also prevents a determination of which individuals, if any, are similarly situated. Many of the individuals are clearly improper parties in this action. For these reasons, the court rejects below all of the 3727 consents.

8. For purposes of the present motion, the court has assumed that such a claim is legally possible. Defendant argues that "there could be no colorable basis in fact or law for capping the overtime pay of a FLSA non-exempt federal employee pursuant to" the Federal Employees Pay Act ("FEPA"), 5 U.S.C. § 5542. Accordingly, defendant maintains that no individuals would exist in Class 3.

## B. Adequacy of the Written Consents

Defendant urges that the manner in which the consent forms were obtained and filed implicates RUSCC 11. That rule provides in part:

The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Defendant argues that plaintiffs' counsel violated this requirement in three regards: first, because the individuals seeking to join are not similarly situated within the meaning of 29 U.S.C. § 216(b); second, because the consents were solicited under false pretenses; and third, because no good faith investigation was conducted as to the legal or factual basis for each individual claim. Because a significant proportion of the written consents are either illegible, lacking necessary information, or clearly filed in error, and because the court cannot therefore determine which individual employees are validly represented by the three named SSA plaintiffs and which are validly represented by Love, all of the 3727 employees named in the written consents are dropped as parties to this action.[9]

The notice of consent filing naming the 3727 employees is merely a list and puts virtually no information before the court. The only information consistently provided is a name. Virtually all names are paired with a zip code and approximately half show a social security number. In addition, plaintiffs have furnished copies of parts of the consent forms themselves. There are two types of forms. Type I contains the statement that the employee gives consent "to AFGE [American Federation of Government Employees] to present any overtime claims against the Social Security Administration pursuant to the decision rendered in *AFGE, AFL-CIO v. OPM.*"[10] The form contains a place for a signature, address, and agency component. Type II identifies this pending action, gives consent for participation, and then gives a choice of two assertions:

Please circle one or both of the following statements which best describes your particular situation:

1. I have worked overtime but have not received the full one and one-half rate required by the Fair Labor Standards Act.

2. I have been denied overtime pay because my agency claims I am exempt.

The rest of the form asks for the employee's name, signature, employing agency, grade, step, job title, social security number, union affiliation, home and work telephone numbers, and home address. The copies furnished to the court have information other than name, address, and agency component cut off. The court has reviewed about 300 of these truncated copies. Approximately ten percent are illegible; numerous others are filled out only in part. During oral argument, plaintiffs' counsel stated, however, that the originals are more legible, and that he has in his possession the complete forms. Even the complete Type I form, though, gives very little data and, combined with the solicitation notices to employees, resulted in little self-screening.

---

9. This does not preclude future new complaints and motions to consolidate, or motions to intervene, by these employees.

10. The claims represented by the three SSA Claims Representatives relate to the propriety of their exempt status as opposed to any overtime compensation allegedly due as a result of the D.C. Circuit's invalidation of the OPM presumption regulations. In this regard, therefore, the

Type I consent forms are misleading and inadequate, at least as to Class 1 employees. If the SSA plaintiffs are alleging that the *AFGE* decision independently gives them a claim for overtime, perhaps because of the OPM regulation defining "executive" employees, 5 C.F.R. § 551.204 (1986), that was also declared invalid, they have not made this contention known to the court.

Defendant attached the affidavit of Cecil Conklin, a Department of Justice paralegal, to its reply brief. As later supplemented, Conklin's affidavit states that she reviewed 1255 of the consent forms and recorded information for each of the four groups she examined (group numbers 2, 6, 8, and 10).

Group 2 consisted of 492 forms, apparently all from SSA employees. Forty-two were illegible or blank. Three hundred and one contained no information on the individual's classification series, grade, or FLSA status. Of the remaining 149 consents, a wide range of job titles was listed. Moreover, four GS–12 attorneys and one GS–12 computer specialist were included.

Group 8 consisted of 316 forms. Twenty were illegible; twenty-two were partly legible. There were over fifty job titles represented among the remaining forms. One hundred and one individuals were classified GS–12 or above, including senior auditors, engineers, computer analysts, instructors, and a GM–14 logistics management specialist. In the group of persons graded at the GS–9, 10, or 11 level, fifteen appeared to be professionals (engineers, architects, nurses, special agents, and law enforcement instructors). Among the agencies represented were the Departments of Agriculture, Commerce, Defense, Housing and Urban Development, Justice, Labor, and Treasury, as well as the National Aeronautics & Space Administration, Office of Personnel Management, and the Veterans Administration.

Groups 6 and 10 had characteristics similar to Group 8, but the court notes in particular that they included the following: a GS–13 Aerospace Engineering Supervisor, a GS–12 Supervisory Property Management Specialist, a GS–13 Deputy Assistant District Director, and a number of professional persons.

Conklin's affidavit came in defendant's reply brief and thus plaintiffs did not have a formal opportunity (beyond oral argument) to respond to it. The court would normally not consider it, but plaintiffs did not contest the data as summarized. At oral argument, plaintiffs' counsel in effect conceded most of defendant's findings.

Plaintiffs' counsel's affidavit states that he took some steps to weed out persons who did not have proper claims or should not be joined. Those steps were obviously inadequate, as measured by counsel's own comments during oral argument. He concedes that Arthur Blunt, one of the individuals named in the amended complaint, is not a proper plaintiff. Moreover, counsel offered to go through the consents already filed and pull out other such professionals and exempt personnel, as reflected in the following dialogue with the court:

... I have since received information on what jobs were historically, because that is the proper perspective, historically exempted or nonexempted back in the summer of '85, prior to the regulations.

I would certainly be willing to sit down and go through each pile that has been submitted, as well as piles that we intend to submit, that we already have confidence in their being clean, and pull out every consent and notify those employees of that fact. From those job descriptions that as in Arthur Blunt's case have no business being there and should not have been submitted in the first place. I am quite willing to do that, even the end of this week....

THE COURT: How would you go about doing that?

MR. HENDERSON: Well, we would actually sit down with the consents, the piles of consents, with their piles and my original piles, and go through them one by one. And quite often the consents, although not grouped alphabetically, are grouped by job description. They came in a bunch, and you get to the top of one pile, and for some reason it is a pharmacist from the VA, the next ten may be pharmacists. They can all come out, and get a letter back to them—

THE COURT: Well, how do you find out that they are pharmacists at the VA?

MR. HENDERSON: Because it should say on the consent.

That is precisely the screening that should have taken place long ago, however. In addition, the consent forms and the solicitation notices posted by the employee associ-

ation provided virtually no self-screening information. The clear import was that the result in *AFGE v. OPM* entitled people to retroactive overtime pay. *See supra* note 10. No real effort was made to screen out those people made exempt by the FLSA:

> THE COURT: "The FLSA only exempts from overtime coverage employees who customarily and regularly direct the work of others," I am reading from Attention All Employees Notice. Aren't there some other exemptions?
>
> MR. HENDERSON: There is the administrative exemption and the professional exemption, as well as the executive exemption.
>
> THE COURT: All right, could that be why you picked up some pharmacists and attorneys and others?
>
> MR. HENDERSON: That could be, that could be.
>
> . . . .
>
> THE COURT: Well, if the job title and grade and step were requested in the case at bar, as it was apparently in Parker, wouldn't that have been a basis for eliminating a lot of people?
>
> MR. HENDERSON: That's correct.

While many of the 3727 employees may work for SSA, like the three originally-named plaintiffs, it is not possible to say with any certainty who those employees are, much less whether they hold the same jobs as the named plaintiffs. The lack of precision in the solicitation of SSA consents is reflected in counsel's defense of the Type I consent form:

> Now, it may be one of those employees went home and xeroxed a copy of a blank and gave it to his next door neighbor, who works for the Air Force. But it was created by Social Security local, and distributed by Social Security local, and it was sent in by Social Security local, and I think if you work that factor in to the Defendant's numerical analysis, when he says that so much were unintelligible, and so much we could only identify only these making Social Security, and the remaining 60% we didn't know where they came from—Well, they were all Social Security as well, or ought to be.

Except for the very occasional exception where the employee himself, and it does happen, passes it on to a neighbor, who works at a different agency.

As counsel concedes, no written instructions were sent to the local level on how to obtain consents:

> THE COURT: All right, do you have any kind of written instructions that accompany this?
>
> MR. HENDERSON: No. It wasn't created at this level. They were created at that level.
>
> THE COURT: Well, I understand, I mean, how were they circulated? Was there an announcement on the bulletin board, or—how was this done?
>
> MR. HENDERSON: I don't have the slightest idea. In some cases they could have been circulated in some of the literature, possibly circulated by desk drop among the units of claims representatives by those locals who typed up those consents. But as I say, the statute requires that a consent be part of an FLSA action, they don't have to describe the action, give further information, and certainly that stuff is discoverable and we are certainly willing to cooperate.

The most telling indication that there was no meaningful effort to assure commonality is reflected in this exchange:

> THE COURT: Now, how, number one, do you know, and how, number two, am I supposed to know that they are similarly situated?
>
> MR. HENDERSON: Right. Because the representations were made by these employees that they were suffering an FLSA injury.
>
> . . . .
>
> THE COURT: What about the other group, now? The ones that aren't Social Security employees.
>
> MR. HENDERSON: In order to correctly identify whether or not they have a legitimate claim, it is important for me to get from them evidence of a pre-November '85 nonexempt status.
>
> THE COURT: And was that done prior to filing the notice of consent?

MR. HENDERSON: That was not done prior to that filing.

The only "capping" representative (Class 3), Blunt, was never properly a party:

MR. HENDERSON: ... It appears that Mr. Blunt has been legitimately exempted. He would have made a very good capping class representative, if you will, had his information been true, and it appeared to be true, until the point that I got information attached to a motion for sanctions.

Finally, there is a question as to those SSA employees who should not be joined because they were parties to *Cervino, et al. v. Matthews,* No. 76–1384 (E.D.Pa. July 13, 1978), in which the district court ruled that certain GS–9, 10, and 11 "Claims Examiners" were properly treated as exempt.

THE COURT: ... How are you going to distinguish ... *Cervino?*

MR. HENDERSON: We are going to have to argue that it was [an] incorrect decision.

THE COURT: Well, if there are in fact [parties in this case who were also in *Cervino* ] they cannot take [another] bite of the apple, can they?

MR. HENDERSON: I would suggest that their case is over, that's correct. Unless there has been a change in their job duties. But I suggest that that is res judicata as to their claim.

The record clearly demonstrates that the consent filings are woefully inadequate. It would be an abuse of the judicial process to permit the court and the discovery process to be used as a substitute for adequate preparation by counsel. While many of the individuals named in the 3727 consent notices may, of course, refile FLSA actions, it was inappropriate for plaintiffs' counsel to simply file consent notices *en masse* without first confirming, after reasonable inquiry, that all of the individuals were similarly situated. Although in other circumstances the court might not require (in a new complaint, motion to intervene, or motion for waiver) much more than valid consents and an assertion of facts supporting a theory of commonality, here there is ample reason to more closely scrutinize the consents. The pleadings, the consent forms, and the subsequent explanations by counsel, however, provide no meaningful basis for the court to distinguish between the many employees. It is not the role of this court to sift through thousands of consent forms—many of which are patently insufficient or clearly show nonsimilarly situated, and properly exempt, employees—to determine which particular employees are correctly named in the action. Accordingly, because it is clear that a significant proportion of the 3727 employees are not similarly situated, and because many of the consents themselves are deficient, all of the 3727 consents are rejected; no waiver of RUSCC 20 and 21 is justified. On that basis, the case is distinguished from *Canfield,* and the 3727 consent filing employees are dropped as parties. RUSCC 21.

Finally, the court reprimands plaintiffs' counsel for his conduct in filing the written consents. As the colloquy during oral argument demonstrates, his certification that the employees listed in the notice of consent were "similarly situated" was not based upon reasonable inquiry. *See* RUSCC 11. No other sanctions under RUSCC 11 are granted.

## CONCLUSION

Defendant's motion to dismiss is denied. The motion to strike (or drop) certain parties is granted as to all but the original three named plaintiffs. The claims of plaintiff Gary Love are severed from this action. The Clerk is directed to assign a new docket number to Love's claim. The request for imposition of monetary sanctions under RUSCC 11 is denied. The parties are directed to file their Joint Preliminary Status Report within thirty days after the date of this order.

It is so ORDERED.