68 F.3d 474
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
John DECARLI and Kay DeCarli, and Michigan Millers Mutual
Insurance Company, a Michigan corporation,
Plaintiffs-Appellants,
v.
CRUSOE'S RIVERTOWN MOTORS, INC., Defendant-Appellee.
 No. 93-2534.
 United States Court of Appeals, Sixth Circuit.
 Oct. 19, 1995.
 
 Before: MERRITT, Chief Judge; KEITH and WELLFORD, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 This is a maritime case arising from the sinking of a private yacht in Lake Huron. John DeCarli and his wife, the owners of the M/V Zeus, sued the Anchor In Marina claiming that Anchor In's unworkmanlike repairs to the vessel made her unseaworthy and resulted in her sinking on July 31, 1991. The DeCarlis' legal theory is that Anchor In breached the implied warranty of workmanlike repair. In a bench trial, the district court found it impossible to tell what caused the boat to sink and held that plaintiffs had not carried their burden of showing that Anchor In breached an implied warranty. The district court also held that even if it assumed that Anchor In breached the warranty of workmanlike repair, it did not believe that a preponderance of evidence showed that the defective repairs caused the sinking. In light of the record and the fact that it is impossible to tell what caused the loss, we must affirm.
 
 I. Background
 
 2
 The DeCarlis purchased the M/V Zeus, a 1965 wooden Matthews Twin Diesel, through Anchor In Marina for $50,000 on July 29, 1989. The DeCarlis used the boat for about 15 hours that summer. At the conclusion of the summer, John DeCarli pulled the boat and stored it for the winter at the Anchor In Marina. While preparing the boat for the 1990 season, DeCarli noticed some discoloration in the paint on the transom which turned out to be a small area of dry rot. After performing some minor repairs and being advised that it was probably O.K. to operate the boat for the season, the DeCarlis used the boat between twenty-one and twenty-eight days that summer.
 
 
 3
 Defendant Anchor In first had the opportunity to thoroughly explore the dry rot problem in January of 1991. Some scheduling conflicts caused Anchor In to delay making its initial assessments. Soon after Anchor In began its inspection of the transom and aft section, Edward McGuire, repair supervisor, phoned DeCarli to tell him that Anchor In had discovered that the problem with the transom was more serious than anyone had anticipated. Apparently, the aft frame of the boat was completely rotted. DeCarli and Anchor In decided that the best course would be to replace both frames and rebuild the transom. During the work, Anchor In discovered still more damage. The ribs were rotted or cracked up through the center of the boat. Facing a potential repair bill that rivalled the value of the boat and not happy with the prospect of owning an expensive pile of firewood, DeCarli decided to go ahead with the repairs hoping to get enough years out of the boat to make it worth the investment. The total bill for the repairs came to approximately $33,000.
 
 
 4
 There is no factual dispute about the manner in which the repairs were made. The Zeus was a double ribbed vessel constructed of white oak. The ribs were originally made of two layers of steam bent oak. The evidence indicates that the majority of the dry rot was on the outer rib. Anchor In used the "West system," a method which utilizes thin strips of mahogany and an epoxy resin compound, to repair the outer ribs. Essentially, Anchor In cut away the rotted out pieces of rib and replaced them with a mahogany-epoxy laminate. When two pieces of wood needed to be joined in the repair, Anchor In used scarf-joints in some places and butt-joints in others. To keep the price of the repair down, DeCarli instructed Anchor In to reinstall the old planking. Completely replanking the boat would have added $30,000-$37,000to the cost of repair. In order to use the old planking, defendant plugged the holes in both the frame and the planks with mahogany dowels soaked in epoxy, used new, longer screws, and capped the holes with wood and laminates.
 
 
 5
 On or around July 5, 1991, the DeCarlis picked up their boat. They used the boat several times during the month of July without incident. Toward the end of the month, the DeCarlis decided to take a vacation on their boat. They piloted the boat from Duncan Bay, near the mouth of the Cheboygan River, to the North Channel. On the sixth day of the voyage, they travelled to Alpena, Michigan. Because of a problem with the diesel engines, the DeCarlis had to stay over in Alpena for several days while the engines were repaired.
 
 
 6
 Early on July 31, 1991, the DeCarlis left Alpena on the boat. They intended to travel to Port Austin. The wind and seas kicked up. The wave heights were between six and eight feet. Every half-hour John DeCarli performed a below-deck inspection while the boat rocked and tossed in the waves. During his inspection at 11:30 am, DeCarli heard a creaking sound coming from the front of his boat. When he pulled up the carpeting to check the bilge area, he observed some water coming in between the planks in the bow and noticed that the stringers and ribs were in motion. The slight weeping of water had occurred earlier so DeCarli did not think that was unusual. He did, however, reduce his speed to 9 knots.
 
 
 7
 Shortly after returning to the deck, DeCarli saw a large white cap crest over the bow and felt an unusual vibration or quiver. The boat then began to feel different to him. Something had changed in the way the Zeus was running. DeCarli went below to investigate. He started from the bow of the boat and worked his way aft. In the aft cabin, he saw a dark stain on the carpet. There was water bubbling around the door of the head. When he opened the door, he was hit by a wall of water. The steps from the aft cabin started to bounce up and down and water gurgled up as he ran up the stairs. Looking back as he jumped the stairs to get on deck, DeCarli noticed that all five bilge pump lights were on. At that point, DeCarli made the decision to abandon ship. DeCarli barely had time to radio in a mayday, grab a few possessions and get in the dinghy. The top decks were awash after 20 minutes. DeCarli recalled that the entire bow of the boat was already under water by the time he got into the dinghy. Only the stern was above water. The Zeus came to rest about 200 feet below the surface of Lake Huron. It was never recovered.
 
 
 8
 The DeCarlis brought claims against Anchor In Marina for negligence, breach of warranty and breach of contract. Testimony at the bench trial held before Judge Enslen focused on the general acceptability of the repairs for boats of that type and the probable cause of the sinking. Plaintiffs introduced the testimony of Commander Deck, a marine consultant who has expertise in naval architecture and mechanical engineering. Deck testified that the use of mahogany laminate and butt joints was improper for a dual ribbed vessel constructed wholly from white oak. Deck stated that the replacement mahogany, without the compensation of additional thickness, made the ribs much less able to absorb the loads and stresses placed on them. In addition, he testified that butt joints have only twenty percent of the strength of a continuous piece of wood and that scarf joints should have been used. Finally, Deck found fault with Anchor In's use of mahogany plugs. He stated that oak has twice the screw holding power of mahogany. Deck concluded that these deficiencies led to a catastrophic breach of the hull in the repaired area. Plaintiffs' other witness was Scott Reynolds from the Matthews Boat Company. Reynolds was less critical of the way in which Anchor In repaired the boat than was Deck. Reynolds would not offer an opinion as to whether the repairs were proper or improper; he merely ventured that he did not care for the type of repair done. Reynolds was particularly critical of DeCarli's decision to recycle the old planking as a cost saving measure. He stated that the Matthews company would not have allowed the old planking to be put back on, and that if the owner insisted, the owner would have been required to sign a waiver.
 
 
 9
 Defendant's witnesses testified that the repairs were done in a workmanlike manner and were proper for a boat of that type. William Barnhardt, an experienced marine surveyor, testified that the repairs performed by Anchor In were totally satisfactory and were the sort of repairs that he would have recommended had he been the principal surveyor. Ed McGuire, a supervisor at Anchor In, stated that the West System was accepted in the industry for repairing boats. Defendant's other witnesses disagreed with Deck's specific criticisms of the repairs. McGuire stated that the mahogany laminate used in the ribs was actually much stronger than normal mahogany because the process yielded cross directional grain. James Watson disagreed that oak has greater screw holding power than mahogany. He said that tests performed at Gougeon Brothers demonstrated that mahogany performed as well as oak. Watson further contradicted Deck on the acceptability of butt joints.
 
 
 10
 Turning to the likely cause for the sinking, defense witnesses testified that a structural failure in the bow where the boat had not been repaired seemed most probable. This could either be caused by overdriving the boat in high seas or striking a dead head. Robert Whitfield, a civilian employee at the Department of the Navy, testified that only a breach in the hull near the bow of the boat could account for the massive amount of water that the boat took in so quickly. That is the area where the water pressure is the greatest. He believed that, short of a catastrophe, the bilge pumps would probably have been able to handle most breaches in the aft section of the hull where the repairs were made.
 
 
 11
 Weighing the testimony and recognizing that the burden was on the plaintiffs to prove unworkmanlike repairs, Judge Enslen determined that the DeCarlis had not met their burden. Judge Enslen observed that the defendant's witnesses and plaintiffs' witnesses differed in their opinion about the adequacy of the repairs. In the end, the Judge was unconvinced that the defendant's repairs were "unsuitable, unsafe, or rendered the Zeus unseaworthy." J.A. at 77. Additionally, the Judge found that the evidence indicated that a breach occurred in the bow section of the boat. He did not believe that a failure in the reconstructed stern transom or stern ribs was the proximate cause of the accident. The plaintiffs did not rely on any recognized burden shifting doctrine in aid of their theory that the loss was the fault of the defendant.
 
 II. Discussion
 
 12
 The DeCarlis' maritime claim sounds in contract, not tort. Thus, the district court was correct to treat the DeCarlis' suit as a warranty action. The rule set out by the Supreme Court in East River Steamship Corp. v. Transamerica Delaval, Inc., held that "[d]amage to a product itself is most naturally understood as a warranty claim," not as a tort claim. 476 U.S. 858, 872 (1986). This rule is applicable in the repair context. "Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain--traditionally the core concern of contract law." Id. at 870. If the rule were otherwise, "contract law would drown in a sea of tort." Id. at 866.
 
 
 13
 General maritime law requires that a contractor perform repairs in a workmanlike manner. See Little Beaver Enters. v. Humphrey Rys., Inc., 719 F.2d 75, 77-78 (4th Cir. 1983) (discussing the origins of this warranty). Under admiralty law, when a contractor repairs a vessel, he impliedly warrants that the work will be done diligently and with the "attention and skill adequate to complete the task." Id. at 78. The warranty is breached "where repair jobs are improperly performed; ... where efforts intended to prevent damage to a ship have been ineffective .... [and] ... where the equipment chosen for a specific purpose is defective or unsafe." Id. (citations omitted). The warranty of workmanlike service does not, however, make the repairer a guarantor of the results of the repair. In the instant case, Anchor In would breach the warranty if the repairs it performed rendered the boat unseaworthy. The scope of Anchor In's liability is determined by the implied warranty on the repair. The warranty does not make Anchor In a general insurer of the boat. Thus, Anchor In cannot be held accountable for a failure in an unrepaired section of the boat. Moreover, the mere fact that the boat sank is not sufficient evidence in and of itself that the repairs made the boat unseaworthy or that the repairs were unacceptable.
 
 
 14
 The scope and nature of our review of the district court's findings of fact is quite limited. Federal Rule of Civil Procedure 52(a) sets out the degree of deference to be accorded a district court's findings in a bench trial: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." A "reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court." Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). The Supreme Court has warned:
 
 
 15
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently ....
 
 
 16
 This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.
 
 
 17
 Id. at 573-74. The rule of thumb in this Circuit is that "[T]he factual conclusions rendered by a district court sitting without a jury are binding on appeal unless this Court is left with a definite and firm conviction that a mistake has been made." Owens-Illinois, Inc. v. Aetna Casualty & Surety Co., 990 F.2d 865, 870 (6th Cir. 1993) (quoting Sawyer v. Arum, 690 F.2d 590, 591-92 (6th Cir. 1982)).
 
 
 18
 The problem with this case is that the Zeus was never recovered after she went down. This, of course, made determining why she sank very difficult. Did she go down because of faulty repairs, captain error, or act of God? We do not know. In the cases cited by the plaintiffs, the damaged vessels were recovered and an inspection was made of the repairs. In those cases, experts could determine where the failure occurred and intelligently testify about the probable cause of the failure. Here, by contrast, without the aid of real evidence, the plaintiffs have tried to prove that the Zeus sank because the repairs, even if performed adequately, were not proper for a boat like the Zeus. The fact that she sank so soon after such extensive structural repairs is indeed suspicious, and were we the ones trying this case initially, we may have come out differently. Nevertheless, we are not left with the definite and firm conviction that the inferences the district court drew from the testimony are implausible. Our review of the testimony, especially that of defense witnesses, does not convince us that the plaintiffs' point of view is the only plausible one or that defendant's testimony was so internally inconsistent that a reasonable fact finder could not credit it. There was sufficient testimonial evidence that the use of a mahogany-epoxy laminate is accepted in the industry for repairing boats like the Zeus. The evidence also supported an inference that the breach in the hull occurred near the bow, not the stern. Contrary to plaintiffs' assertion, defense witnesses did contradict Commander Deck's "scientific" testimony. Because there was conflicting scientific evidence, we cannot say with a sufficient degree of certainty that a mahogany laminate does not have the strength or screw-holding power of oak. We therefore affirm the district court's holding that the plaintiffs did not carry their burden in proving both that Anchor In's repairs were unworkmanlike and that the boat sank because of a failure in the repaired sections. JUDGMENT AFFIRMED.