Stacy L. AAMOLD, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 94–638C.

United States Court of Federal Claims.

Dec. 12, 1997.

Michael Marshall, Baltimore, MD, for plaintiffs.

Hillary A. Stern, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

MILLER, Judge.

This case is before the court after argument on plaintiffs' motion for partial summary judgment and defendant's cross-motion for summary judgment. The issues are whether security officers' 30–minute meal periods are compensable as overtime under the Fair Labor Standards Act, 29 U.S.C. § 207(a) (1994) (the "FLSA"), and, if so, whether certain officers nevertheless fall under an executive or administrative exemption to the FLSA overtime provisions. 29 U.S.C. § 213(a)(1).

## FACTS

The following facts are undisputed, unless otherwise noted. Plaintiffs are approximately 175 security protective officers ("SPOs") employed by the National Security Agency ("NSA"). SPOs provide security for NSA premises and personnel. Their specific duties vary with the post position to which they are assigned and include 1) providing armed defense for NSA personnel and facilities; 2) maintaining access control of personnel and vehicles; 3) inspecting NSA facilities to ensure compliance with security requirements; 4) maintaining access control of the agency facilities; 5) scrutinizing and monitoring the ingress and egress of people and vehicles and inspecting packages, containers, and materials; 6) providing access control of all visitors, thereby ensuring that visitors do not bring contraband into NSA facilities; 7) patrolling buildings and grounds, on foot or by vehicle; 8) performing control desk duties, such as monitoring computerized alarm systems; and 9) enforcing laws and NSA regulations.

Armed and uniformed, SPOs staff both fixed and mobile positions or posts, including a mobile or vehicle patrol, gatehouse, and panel or communications room (which include dispatch, computerized alarm systems, and radio and telephone communications). Since late 1994, rather than rotate among different positions, SPOs have been assigned to specific positions. SPOs' assignments and duties are determined by a number of different factors. First, SPOs are classified by grade, beginning with the entry-level grade GG–05 up to GG–14. SPOs of grades GG–07 and –08 are considered journeyman and senior journeyman positions, respectively. Second, SPOs are classified by rank, from unranked SPOs, to sergeants, to lieutenants, to captains.[1] Third, each SPO is assigned to one of NSA's four organizational or geographical zones.[2] In each zone, SPOs occupy fixed-post, mobile, and panel or communications room positions. A captain commands each zone. In addition to being assigned to a zone and to a position, SPOs also are assigned to one of three shifts: 1) from 5:30 a.m. to 2:00 p.m.; 2) from 1:30 p.m. to 10:00 p.m.; and 3) from 9:30 p.m. to 6:00 a.m.

Plaintiff sergeants are ranked GG–09. According to occupational standards, GG–09 SPOs "are required to exercise the full range of first line supervisory and management skills in the supervision, leadership, and training of uniformed security officers." Oc-

---

**1.** No plaintiffs are captains, and only a few are lieutenants or sergeants.

**2.** For each of the four zones, NSA named a designee pursuant to RCFC 30(b)(6). The testimony of these designees forms much of the basis for plaintiffs' motion for partial summary judgment.

cupational Group 35, Senior Security Protective Officer, Security Protective Officer, COSG 353F, 352F, T.L. No. 6 (Oct. 1988), at 35–36. Their duties include 1) supervising all aspects of the agency's protective service operations; 2) establishing and revising schedules and arranging for overtime work; 3) training and supervising the training of SPOs; 4) reviewing the agency's general protective security procedures and making recommendations to supervisors regarding improvements to the system; and 5) preparing written and oral reports. Sergeants also may recommend promotions and disciplinary actions of SPOs to the lieutenants and captains, who may or may not heed the recommendations. However, the parties dispute the degree to which sergeants exercise discretion and independent judgment in activities such as work planning and organization; work assignment, direction, review, and evaluation; and personnel administration. Plaintiffs assert that sergeants only apply NSA regulations to routine situations and may not deviate from the guidelines without a supervisor's consent.

Regardless of grade, assigned zone, position, or shift, SPOs officially are on duty eight hours per day and they receive a 30–minute meal period, which is not considered duty time under NSA guidelines. NSA Administrative Manual (Oct. 19, 1988), at 4–1. The guidelines state explicitly that "SPOs who are required to respond to emergency situations during meal periods will be compensated in accordance with applicable overtime regulations." *Id.* The parties do not dispute that during their meal period, SPOs are limited in their practical ability to leave NSA premises. They are subject to being called back to work, must remain in uniform, must carry their weapons during their breaks, and must respond to visiting citizens' or employees' questions.

Plaintiffs contend that they are actually on duty 8.5 hours a day and that during their 30–minute meal periods they perform substantial emergency and non-emergency duties that entitle them to overtime compensation for this time pursuant to the FLSA. 29 U.S.C. § 207(a)(1). For example, plaintiffs are interrupted to open gates, buildings, and offices, issue identification badges, escort personnel, answer routine telephone and radio calls, and verify clearances. Plaintiffs contend that their meals are interrupted "daily" or "several times a week." *See, e.g.,* Deposition of Stanley J. Renkiewicz, Dec. 18, 1996, at 40, 77; Deposition of Thomas Lee Carrington, Dec. 4, 1996, at 85. Although an SPO who is required to perform emergency duties during a 30–minute meal period can seek overtime, plaintiffs testified at deposition that overtime requests are strongly discouraged and that interruptions are seldom recorded. During oral argument counsel explained that, because plaintiffs feared charges of insubordination, they ceased to seek overtime after being rebuffed.

Plaintiffs moved for partial summary judgment on the grounds that their meal time is compensable as overtime pursuant to the FLSA and that they are non-exempt employees under the Act. Defendant responded with a cross-motion for summary judgment, asserting that plaintiffs are not required to perform substantial duties during their meal periods, and, even if they were, plaintiffs are not entitled to overtime compensation because sergeants (SPO GG–09) are exempt from FLSA coverage pursuant to the executive exemption, 5 C.F.R. § 551.204 (1994), and SPOs of grades of GG–07 and higher are exempt pursuant to the administrative exemption. 5 C.F.R. § 551.205.

### 1. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Seal–Flex, Inc. v. Athletic Track and Court Const.,* 98 F.3d 1318, 1321 (Fed.Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202. (1986)). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Both plaintiffs and

defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in dispute and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

When resolving a motion for summary judgment, the court may not weigh the evidence and seek to determine the truth of the matter. *Anderson,* 477 U.S. at 249, 255, 106 S.Ct. at 2510–11, 2513–14. Moreover, the court cannot make credibility determinations. *See Jay v. Secretary of DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14). Furthermore, the non-movant is entitled to "all applicable presumptions, inferences, and intendments...." *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (1984). A trial court may deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

### 2. *The FLSA*

The Court of Federal Claims has jurisdiction to hear suits brought by non-exempt federal employees to recover unpaid overtime compensation. 29 U.S.C. §§ 204, 216; *see Beebe v. United States,* 226 Ct.Cl. 308, 316, 640 F.2d 1283, 1285 (1981).

Pursuant to the FLSA, employees—including federal employees[3]—may not work over 40 hours per week without receiving overtime compensation at the rate of one and one-half times the regular rate of the employees' pay. 29 U.S.C. § 207(a)(1). This overtime framework applies to all employees, except those who fall within one of the FLSA exemption provisions, including the executive, administrative, and professional exemptions. 29 U.S.C. § 213(a)(1).

While the Department of Labor ("DOL") determines the scope of the FLSA exemptions for private sector employees, the Office of Personnel Management ("OPM") interprets the scope of the FLSA exemptions for federal employees. 29 U.S.C. § 204(f); *Zumerling v. Devine,* 769 F.2d 745, 750 (Fed. Cir.1985). OPM promulgates regulations that supplement and implement the FLSA, which must be read in conjunction with the Act. 5 C.F.R. § 551.101(c).[4]

OPM regulations applying the FLSA to federal employees set forth several criteria for the executive, administrative, and professional exemptions. Defendant maintains that various plaintiffs are exempt pursuant to either the executive or administrative exemption. 5 C.F.R. §§ 551.204–.205. Defendant bears the ultimate burden of proving that an employee is subject to an FLSA exemption. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); 5 C.F.R. § 551.202(b). Not only must defendant prove each specific element of the exemption, *Walling v. General Industries Co.,* 330 U.S. 545, 547–48, 67 S.Ct. 883, 883–84, 91 L.Ed. 1088 (1947), but courts are to interpret the FLSA overtime provisions liberally and the exemptions narrowly. *See Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); 5 C.F.R. § 551.202(a).

### 3. *Entitlement to compensation for 30–minute meal period*

Plaintiffs seek overtime compensation for each 30–minute meal period, not just the

---

**3.** As federal employees, plaintiffs are protected by two statutes requiring compensation for overtime work. Section 7(a)(1) of the FLSA, 29 U.S.C. § 207(a)(1), requires overtime pay "for a workweek longer than forty hours;" and section 5542(a) of the Federal Employees Pay Act, 5 U.S.C. § 5542(a) (1994), requires overtime pay for work "in excess of 40 hours in an administrative workweek, or ... in excess of 8 hours in a day." On May 1, 1974, the FLSA became applicable to federal employees. 29 U.S.C. §§ 203(d), (x) (1994). Plaintiffs bring this suit only under the FLSA.

**4.** OPM's regulations and interpretations must be consistent with the FLSA itself and with the standards set by DOL for the private sector. *See Lanehart v. Horner,* 818 F.2d 1574, 1578 (Fed. Cir.1987). While OPM regulations are controlling and are entitled to great deference, *see Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 798, 13 L.Ed.2d 616 (1965), the court also can consider DOL's regulations. *See American Fed'n of Gov't Employees v. OPM,* 821 F.2d 761, 769–71 (D.C.Cir.1987).

amount of each meal time that they have spent engaged in job-related duties. Defendant counters that plaintiffs can and should seek overtime compensation for those specific periods in which they perform substantial job-related duties, not for all 30–minute meal periods.

Plaintiffs point to several factors to support a finding that their meal time is compensable. First, they assert that, as a practical matter, SPOs are unable to leave NSA premises for their meals. Second, SPOs are subject to being on-call during their meals; in all four zones they are required to maintain two-way radio contact with their supervisors. Third, plaintiffs contend that SPOs frequently are interrupted during their meal periods to perform a range of non-emergency and emergency duties[5] that allegedly consume "significant portions of their meal periods." Plfs' Br. filed Sept. 9, 1997, at 27. Fourth, plaintiffs are required to remain in uniform. Fifth, plaintiffs posit that the mere presence of a uniformed officer confers a benefit to NSA.

The governing authority, however, indicates that several of these factors—remaining on NSA premises, maintaining radio contact, and remaining in uniform are insufficient to establish meal-time compensability. In *Agner v. United States,* 8 Cl.Ct. 635 (1985), *aff'd,* 795 F.2d 1017 (Fed.Cir.1986), the Claims Court held that members of the Library of Congress police force had duty-free lunch time, so their compensated lunch time could offset uncompensated pre- and post-shift work. The police officers were required to remain on library premises, armed, and in uniform and to maintain two-way radio contact with their supervisors. According to plaintiffs in the case at bar, the police officers in *Agner* did not perform substantial duties, in contrast to the SPOs who allegedly perform substantial work that deprives them of a significant portion of their meal period. *Agner* stated the rule regarding compensation for "hours worked" under both the Federal Employees Pay Act, 5 U.S.C. § 5542(a) (1994) (the "FEPA"), and the FLSA:

> If covered employees perform substantial duties during their lunch breaks they must be paid and that time may not be offset against other, uncompensated work periods. If they are relieved of substantial duties, they are following their own pursuits not the employer's, and this time, if compensated, may offset the other periods.

8 Cl.Ct. at 637.

■ *Agner* followed the rule set forth in *Baylor v. United States,* 198 Ct.Cl. 331 (1972). *Baylor* involved a case for meal-time compensation under the FEPA. The Court of Claims held that the lunch period of General Services Administration security guards, who were relieved regularly for lunch, was duty free and not "hours of employment," although they were required to remain on the employer's premises, in a duty status, and subject to emergency call. The court noted that "the mere fact that an employee is required to eat lunch on the employer's premises and to be on a duty status, subject to emergency call during such period, does not convert this private leisure time into compensable time." *Baylor,* 198 Ct.Cl. at 364. In order for meal time to be compensable. plaintiffs must demonstrate that job-related duties "substantially reduced [their] duty free time." *Id.* Although subsequent courts have not defined "substantial" vis-a-vis either reduction of meal time per day or week, the Claims Court in *Agner* declined to follow DOL's regulations regarding what constitutes a "bona fide meal period."[6] *See*

---

5. These duties include the following: (1) opening gates, buildings and offices; (2) issuing I.D. badges and escorting personnel; (3) answering phones and radio calls; (4) verifying security clearances; (5) issuing keys and attending to jammed up key machines; dealing with elevator problems; (6) taking trash out; (7) handling deliveries on the loading dock; (8) sergeants and lieutenants have to deal with people calling out sick 'every day'; (9) reporting to supervisors; (10) sergeants answer questions from officers and other agency personnel and do paperwork during their meal period; and (11) giving directions to those who request them.
Plfs' Br. filed Sept. 9, 1997, at 27 (citations to supporting depositions omitted).

6. 29 C.F.R. § 785.19(a) states:
Bona fide meal periods are not work time ... the employee must be completely relieved from duty for the purposes of eating regular meals.

8 Cl.Ct. at 638 (noting that regulations are not binding on court). Furthermore, even if plaintiffs' designated meal time was interrupted, they cannot recover overtime compensation if they were allowed to take their meal period at another time during their eight-hour shift. *See Baker v. United States,* 218 Ct.Cl. 602, 622, (1978).

 Significantly, the parties dispute the extent of the interruptions—what portion of time out of each meal period is interrupted by job-related duties and how often each week these interruptions occur. Although plaintiffs allege that because 1994 meal-time interruptions[7] were "frequent"—from three times a week to daily—it is unclear how much time these interruptions consumed each day and the exact nature of the interruptions in each zone and on each shift. The factual issues regarding the extent of meal-time interruptions are evident when comparing the deposition testimony of the four Rule 30(b)(6) designees—captains of each of the four zones—to that of the four plaintiffs who were deposed.[8] In order for meal periods to be compensable, plaintiffs must demonstrate that job-related duties "substantially reduced [their] duty free time." *Baylor,* 198 Ct.Cl. at 364. This is a fact-intensive inquiry requiring the weighing of uncertain, and perhaps conflicting, evidence, which the court cannot accomplish by summary judgment. *See Jay,* 998 F.2d at 982 (citing *Anderson,* 477 U.S. at 249, 255, 106 S.Ct. at 25210–11, 2513–14).

Plaintiffs contend that NSA's failure to keep records concerning the frequency of meal time interruptions justifies reliance on their testimony. They cite *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 1192–93, 90 L.Ed. 1515 (1946), for the proposition that "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Although they have offered plaintiff Carl F. Carlson's affidavit to explain how long specific meal-time interruptions can last, plaintiffs do not demonstrate with any particularity how often these interruptions occur and how much of each meal period is consumed by such interruptions. Indeed, plaintiffs admit that "[t]his testimony only elucidates the fact that SPOs perform substantial duties during their meal periods, and these duties. at a minimum, deprive SPOs of several minutes of their meal period." Plfs' Br. filed Sept. 9, 1997, at 26. Plaintiffs have yet to present evidence regarding the "amount and extent" of meal-time interruptions and duties performed sufficient to meet their burden under *Mt. Clemens Pottery.* In fact, two of the four deposed plaintiffs, Messrs. Carlson and Clark, admitted in their testimony that prior to 1994 there were very few meal-time interruptions.

 All four deposed SPO plaintiffs testified that after 1994 they were rarely able to enjoy uninterrupted meal periods and that interruptions were "frequent." The interruptions cited cannot be presumed to apply

Ordinarily thirty minutes or more is long enough for bona fide meal periods. A shorter period may be enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

7. Plaintiff Carl F. Carson avers that job "duties performed during the meal period consume different periods of time." Affidavit of Carl F. Carlson, Aug. 29, 1997, ¶ 4. For example, opening offices may take from 10 to 15 minutes; issuing badges may take from 5 to 15 minutes (if there are clearance problems); escorting personnel takes approximately 10 minutes; verifying security clearances takes on average of 5 minutes; issuing keys takes approximately 7 minutes; opening the loading dock takes at a minimum approximately 5 minutes to as long as 15 minutes. *Id.*

8. For example, plaintiff Stanley J. Renkiewicz testified:

It's never ending in that building. People constantly are coming in there to get keys, whether it be a backup key, or a cleaning key, or the key machine jams up, or 911 hangups, or somebody stuck in the elevator, or a back door needs to be opened, somebody to take the trash out, or you have deliveries coming in or out, and I can go on and on, or the phone's always ringing. It is never-ending.

. . . .

If you're supposed to be on a lunch break its just impossible with that many people and all the activity that goes on in that place.

Deposition of Stanley J. Renkiewicz, Dec. 18, 1996, at 39.

to all plaintiffs, however, given the three different shifts occur throughout the day—1) from 5:30 a.m. to 2:00 p.m.; 2) from 1:30 p.m. to 10:00 p.m.; and 3) from 9:30 p.m. to 6:00 a.m. Many of the interruptions about which plaintiffs complain occur during the 9 a.m. to 6 p.m. workday when NSA employees and visitors are on the premises, but because the meal times of the third shift occur after NSA employees have left for the day—between 1:00 a.m. and 3:30 a.m.—these SPOs presumably would be subject to far fewer meal time interruptions. Defendant has submitted affidavits from several lieutenants who have supervised the third shift.[9] For example, Lt. Jeffery M. Mallette states:

> Third relief is the slowest time for our work; there are relatively few people around and not many alerts. All officers should have a[n] uninterrupted 30–minute meal break.... I cannot recall having to pay overtime for a missed lunch on third relief.... If an officer on third relief decides to respond to a nonemergency during his scheduled meal break, he should be able to make up his meal time later in the relief.... On third relief, there just are not that many people around to be interrupting them [SPOs].

Affidavit of Lt. Jeffery M. Mallette, July 4, 1997. ¶ 6.

Plaintiffs' evidence of meal-time interruptions is of a very general nature. they present no evidence to suggest that they suffered significant interruptions during this third shift. Plaintiffs were put on notice that defendant sought to draw a distinction between the shifts, as affidavits from six lieutenants who supervised the third shift were included in the appendix to defendant's cross-motion for summary judgment. In their reply plaintiffs failed to address, let alone rebut, this testimony, leaving serious doubt as to the existence and extent of meal-time interruptions during the third shift. Plaintiffs cannot prevail on their motion for summary judgment as to this shift, and they have failed to raise a genuine issue of material fact that would foreclose granting defendant's cross-motion as to this shift.

### 4. Executive exemption

In its cross-motion for summary judgment, defendant contends that plaintiff sergeants (SPO GG–09) are supervisors and are thus exempt from the FLSA under the executive exemption, 29 U.S.C. § 213(a)(1).[10] The position description for GG–09 states that this position requires officers "to exercise the full range of supervisory and management skills in the supervision, leadership, and training of uniformed security officers."[11] Plaintiffs counter that the occupational standards do not reflect accurately the actual duties of a sergeant, which have become less supervisory in nature since 1994. See, e.g., Deposition of Ann Louise Hall, Dec. 18, 1996, at 34. The exact nature of sergeants' duties will be dispositive as to the application of the executive exemption and can only be resolved at trial.

The executive exemption comprises three elements that defendant must prove to warrant a finding of FLSA exempt status:

> 1) [The] ... employee ... manages a Federal agency or any subdivision thereof (including the lowest recognized organizational unit with a continuing function) and
>
> a. Ability to supervise all aspects of the Agency's Protective Service operations;
> b. Ability to establish and revise schedules and to arrange for overtime work to accommodate emergencies, illness, etc.;
> c. Ability to train and/or supervise the training of Protective Security Officers;
> d. Ability to review the Agency's general protective security procedures and to make recommendations to supervisors regarding improvements to the system;
> e. Ability to prepare accurate written and oral reports.

9. Plaintiffs assail defendant's use of affidavits from lieutenants who are not RCFC 30(b)(6) designees as "contraven[ing] the whole purpose of Rule 30(b)(6) and add[ing] complexity to the case." Plfs' Br. filed Sept. 9, 1997, at 12. Defendant is correct that it is not precluded from introducing additional relevant evidence from individuals who are not Rule 30(b)(6) designees.

10. Although defendant's executive exemption argument is directed at sergeants, if sergeants are deemed exempt, so, too, are lieutenants, who are higher ranking.

11. The description continues, "Specialized experience at this grade must demonstrate:

regularly and customarily directs the work of at least three subordinate employees (excluding support employees) . . . ;

2) The employee's primary duty consists of management or supervision. . . . ; [and]

3) [If the employee is a] foreman level supervisor[ ] in the Federal Wage System (or the equivalent in other wage systems), [a] GS–7 through GS–9 . . . [29 U.S.C. § ] 207(k), . . . [or a] GS–5 or GS–6 . . . , [such employee] must spend 80 percent or more of the work time in a representative work week on supervisory and closely related work.

5 C.F.R. § 551.204.

1) Criterion that employee manage subdivision of federal agency, including the lowest recognized organizational unit with continuing function, and regularly and customarily direct work of at least three *subordinate employees*

■ In addition to being supervisors, defendant asserts that sergeants supervise workers who comprise a recognized organizational unit or subdivision of NSA, the Protective Services Division (the "PSD"). Plaintiffs rejoin that sergeants are not in charge of the PSD, which is led by a single chief; that the organizational units are the four zones of the PSD; and that each zone is supervised by a captain, not a sergeant. They note that the interpretive regulation, 29 C.F.R. § 541.104(a), distinguishes between "a mere collection of men assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." At most, plaintiffs contend, sergeants are squad supervisors,[12] and a squad is a "collection of individuals," not an organizational unit.

Defendant analogizes this case to *Amos v. United States*, 13 Cl.Ct. 442, 447 (1987), which interprets the "lowest recognized organizational unit." *See also Baca v. United States*, 29 Fed.Cl. 354 (1993) (employing analysis set forth in *Amos* ). *Amos* involved the question of whether cook foremen at a cor-

rectional institution were exempt under the FLSA. The foremen were responsible for supervising inmate food service workers during daily meal preparation. The workers were divided into different functional groups *e.g.,* food preparation, service, clean up; cook foremen were assigned to supervise each group for different shifts. The court concluded that although both food service workers and foremen rotated among different groups, the foremen still supervised employees in a "recognized organizational unit"— the entire food service division—which was "a cohesive unit dedicated to perform a specific function; *i.e.,* food preparation and service." *Id.* at 447. The food service division was also distinct from other divisions of the prison, and workers performed different duties than inmates in other divisions.

Defendant notes the similarities between the sergeants assigned to supervise SPOs in a given shift, zone, and squad and the cook foremen who supervised the food service workers in *Amos*. Given the structure of the PSD and the duties of SPOs and sergeants, the analogy to *Amos* is apt. As the food service workers who had different duties in the food service division. SPOs also have different duties. but all work in the PSD, which—like the food service division—is a "cohesive unit" with a "specific function"— protecting NSA facilities and employees. *Id.* at 443.

As for the second part of the first criterion, although plaintiffs assert that sergeants only have the authority to recommend promotions and disciplinary actions, they do admit that "sergeants regularly and customarily direct the work of at least three subordinate employees."[13]

2) Criterion that employee's primary duty consists of management or *supervision*

■ The primary duty requirement is met if the employee—here the sergeant,

---

12. Sergeants can be squad sergeants with administrative responsibility for a group of no less than 10 SPOs or shift sergeants with operational responsibility for the approximately 42 SPOs assigned to their shift.

13. Plaintiffs argue in their brief, however, that "[r]egardless of their GG status (whether GG 5, 6, 7, or 8), SPOs do not supervise three or more employees." Plfs' Br. filed Apr. 14, 1997, at 11. The court holds plaintiffs to their response to defendant's proposed finding of fact No. 25.

(1) [h]as authority to select or remove. and advance in pay and promote, or make any other status changes of subordinate employees, or has authority to suggest and recommend such actions with particular consideration given to these suggestions and recommendations; and

(2) [c]ustomarily and regularly exercises discretion and independent judgment in such activities as work planning and organization; work assignment, direction, review, and evaluation; and other aspects of management of subordinates, including personnel administration.

5 C.F.R. § 551.204(a)(1), (2).

Plaintiffs assert that they lack the authority to select, remove, advance in pay, or promote employees. However, this subsection of the executive exemption also refers to having the authority to "suggest and recommend" status changes, in addition to having the authority to actually make such changes. Moreover, consistent with 5 C.F.R. § 551.204(a)(1), defendant argues only that SPOs grade GG–09 and above, ranked sergeants or higher, "have the authority to recommend the selection, removal, advancement in pay or promotion of lower graded SPOs with particular consideration given to their recommendations." Def's Statement of Genuine Issues, No. 10, filed Aug. 8, 1997. Defendant also notes that sergeants "are actively involved in the promotions process" and have the "authority to prepare performance evaluations on their squad" which are reviewed by lieutenants and captains. Def's Br. filed July 11, 1997, at 32.

Contrary to plaintiffs' intimations, the executive exemption does not require sergeants to have final authority, to be free from supervision, or to exercise policy making authority. The exemption merely requires employees to exercise "discretion and independent judgment in work planning and organization." 5 C.F.R. § 551.204(a)(2). Defendant maintains that sergeants exercise discretion and make independent judgments with respect to 1) reviewing staffing needs; 2) assigning SPOs to particular positions; 3) granting and denying leave requests; 4) evaluating SPOs' performance; 5) coaching or guiding SPOs in performing their duties; and 6) recommend-

ing discipline. Plaintiffs proffer the testimony of the agency's own designees, all captains, to argue that in actuality, sergeants do little more than mechanically apply standards or policies to particular situations. This remains a hotly disputed issue, which can only be resolved by trial.

The court may not make credibility determinations or weigh the evidence. *Anderson,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510. Given the number of factual disputes regarding the nature of sergeants' duties, before and after 1994, the court is in no position to enter partial summary judgment on this issue. The court must identify at trial the duties and responsibilities of sergeants vis-a-vis their squads or shifts and determine whether management and supervision were their primary duties according to applicable criteria. In addition to qualitative evidence regarding the nature of sergeants' supervisory duties, defendant must present some form of quantitative evidence for the court to evaluate the third criterion of the executive exemption, which requires an employee to "spend 80 percent or more of the work time in a representative work week on supervisory and closely related work." 5 C.F.R. § 551.204(b).

5. *Administrative exemption*

To meet the administrative exemption of the FLSA, plaintiffs' day-to-day work must satisfy three regulatory criteria relevant to these facts:

(a) The employee's primary duty consists of work that—

(1) Significantly affects the formulation or execution of management policies or programs; or

(2) Involves general management or business functions or supporting services of substantial importance to the organization serviced; [and]

(b) the employee performs office or other predominantly nonmanual work which is—

. . . .

(2) Of a specialized or technical nature that requires considerable special training, experience, and knowledge [and]

(c) The employee must frequently exercise discretion and independent judgment, un-

der only general supervision. in performing the normal day-to-day work.

5 C.F.R. § 551.205.

According to defendant, plaintiff SPOs of grades GG–07 and –08 meet the above criteria and are thus FLSA exempt.

1) Criterion that employee's primary duty consists of work involving *supporting services of substantial importance to organization serviced*

Plaintiffs analogize the duties of SPOs to that of a police force and argue that, rather than provide supporting services, SPOs perform production functions.[14] Defendant argues that SPOs, as part of the PSD, provide a supporting service to NSA—security for NSA facilities and employees. Defendant distinguishes case law holding that police work is production work, *e.g., Reich v. New York*, 3 F.3d 581, 587 (2d Cir.1993), by noting that SPOs are not a separate entity like a police department; rather, SPOs are part of NSA and as such provide supporting services to NSA employees and the agency that employs them. Defendant finds support in *Campbell v. United States Air Force*, 755 F.Supp. 893 (E.D.Cal.1990), *vacated on other grounds*, 972 F.2d 1352 (Fed.Cir.1992). In *Campbell* air traffic controllers were held exempt under the FLSA because they provided supporting services of substantial importance to the Air Force and had duties requiring proficiency using computers, radar, and other technical equipment.

As Judge Tidwell noted in *Adams v. United States*, 27 Fed.Cl. 5, 15 (1992), "the *Campbell* court clearly envisioned support

service employees as those employees whose position provided a service ancillary to the primary function of the agency or organization." Other courts have also made distinctions based on whether the employees "perform the end function itself." *See, e.g., Adam v. United States*, 26 Cl.Ct. 782, 790 (1992) (finding that Immigration and Naturalization Service senior border patrol agents perform production functions and are not administratively exempt ). *See generally Hickman v. United States*, 10 Cl.Ct. 550, 558 (1986) (appendix to the opinion) (finding that electronics technician and computer technician employed by the Navy provide accurate data, a supporting service to the Navy). Furthermore, OPM's FPM letter also defines "supporting services" by providing a non-exhaustive list of several examples,[15] which "all have a managerial flavor." *Adam*, 26 Cl.Ct. at 789.

In light of the factual issues regarding the exact nature of the duties performed by SPO plaintiffs of grades GG–07 and –08, the court cannot resolve this issue on dispositive motions, but suggests that defendant should consider how the SPO's duties conform to OPM's regulatory elaboration of "supporting services." *See supra* note 15.

2) Criterion that employee performs office or predominantly nonmanual, work which is of specialized or technical nature requiring considerable *training, experience, and knowledge*

Defendant contends that, while SPOs do not perform strictly office work, they also do not perform manual work, *i.e.,* that which

---

**14.** OPM has interpreted the § 551.205 criterion in Federal Personnel Manual ("FPM") Letter No. 551–7 (July 1, 1975). Although FPM letters lack the status of regulations, they serve to interpret the regulation and thus can aid the court. The letter provides instructions for applying the FLSA exemptions to federal employees. In describing the general management, business, or supporting services prong of the administrative exemption, the letter distinguished supporting services from production services.

**15.** OPM's FPM Letter No. 551–7, at 9, defines supporting services as:
(1) Providing expert advice in specialized subject matter fields, such as that provided by management consultants or systems analysts;
(2) Assuming facets of the overall management function, *such as safety management,* personnel

management, or budgeting and financial management;
(3) Representing management in such business function as negotiating and administering contracts, determining acceptability of goods or services, or authorizing payments; or
(4) Providing supporting services, such as automated data processing, *communications,* or procurement and distribution of supplies.
. . . However, to warrant exemption, each employee's work must involve substantial discretion on matters of enough importance that the employee's actions and decisions have a noticeable impact on the effectiveness of the organization advised, represented, or serviced. (Emphasis added.)

involves physical strength or dexterity. Plaintiffs argue that SPOs receive law enforcement training that allows them to perform police duties, which, they imply, is manual work. Neither plaintiffs nor defendant offer authority for whether the type of security work SPOs perform comprise duties that should be deemed predominantly manual or nonmanual, perhaps because courts have not consistently defined "nonmanual" work. *Adams,* 27 Fed.Cl. at 16 n. 9 (citing *Campbell,* 755 F.Supp. at 896; *White v. All Am. Cable & Radio,* 656 F.Supp. 1168, 1170 (D.P.R.1987)).[16] The issue is further complicated by the fact that the nature of SPOs' duties varies according to their zone and position.

Assuming, *arguendo,* that plaintiffs perform nonmanual work, their duties must also be specialized or technical and require considerable training and experience. The parties dispute the differences in training received by SPOs of grades GG–05 and –06 (who defendant concedes are non-exempt) versus that received by SPOs of grades GG–07 and –08. Plaintiffs assert that "SPOs of grades GG–07 and 8 perform the same duties as SPOs of grades GG–05 and 6," as established by various zone captains and the plaintiffs. Plfs' Br. filed Sept. 9, 1997, at 52. Defendant counters that SPOs of grades GG–07 and higher receive additional training which confers "technical expertise unique to their positions," Def's Br. filed July 11, 1997, at 37, such as training for the three teams of the Special Operations Unit.[17] Defendant also notes that "plaintiffs' duties require proficiency in working with the computerized systems that aid in the monitoring of security at NSA, as well as other technical equipment." Def's Br. filed Oct. 23, 1997, at 34.

The Federal Circuit has stated:

[T]echnical skills alone do not make employees exempt. Rather, the administrative exemption applies to technical employees whose *primary duties* include specialized management consultation, overall management functions, contract negotiation and administration, and the like. To determine whether a position fits within the exemption, a trial court must have before it sufficient facts concerning the daily activities of that position to justify its legal conclusion.

*Berg v. Newman,* 982 F.2d 500, 502–03 (Fed. Cir.1992).

At this point the court lacks sufficient facts regarding the daily activities of SPOs of grades GG–07 and –08. Material issues of fact exist as to whether plaintiffs in these grades engage in office or predominantly nonmanual labor and have duties of a specialized or technical nature that require considerable special training, experience, and knowledge. This is especially true because SPOs occupy different zones and positions and thus can have a wide range of duties.

 3) Employees exercise discretion and independent judgment under only *general supervision*

This provision mirrors a component of the "primary duty" criterion of the executive exemption, *see supra* p. 744. As such, the same arguments and factual disputes apply.

OPM explained the discretion-and-independent-judgment criterion in FPM Letter No. 551–7. The employee is required engage in "(1) comparing and evaluating possible courses of conduct, and (2) interpreting results or implications, and independently taking action or making a decision after considering the various possibilities."[18]

16. However, some cases involving similar facts have found the work performed "manual." *See, e.g., Roney v. United States,* 790 F.Supp. 23, 27–28 (D.D.C.1992) (finding GS–11 Deputy United States Marshal whose job description was "Criminal Investigator" was not administratively exempt, basing decision partially on manual nature of job); *Adam,* 26 Cl.Ct. at 792–793 (defining "manual" with help of Webster's Dictionary and finding senior border patrol agents perform manual work).

17. The Special Operations Unit consists of the React Team, the Crisis Communication Team, and the Communication Van Team. It is unclear how many plaintiffs belong to that unit.

18. The FPM Letter continues:
The "decisions" made as a result of the exercise of independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decisions are subject to review ... does not mean that the employee is not exer-

· In June 1995 the Chief of the PSD requested an audit to be performed to determine the proper grade for non-supervisory SPOs below GG–09. Pam Matuschek, NSA's Position Management Officer, conducted the audit, which involved interviews of numerous SPOs, especially those in grades GG–07 and –08, regarding their duties and responsibilities. Defendant proffers the audit to demonstrate that SPOs in grades GG–07 and –08 exercise independent judgment and discretion, especially when the guidelines are silent or inapplicable. Plaintiffs assail the audit, arguing that it does not indicate discretion or independent judgment and contains "rather specious and generalized conclusions." Plfs' Br. filed Sept. 9, 1997, at 64. One problem with the audit is the potential for interviewed employees to over-state their duties and responsibilities. In short, rather than clarify the issue, the audit—and plaintiffs' response to it—illustrates the factual disputes surrounding the degree of discretion and independent judgment plaintiffs exercised. The court discounts the audit as non-probative.

Overall, the record contains insufficient facts to justify the legal conclusions propounded by either party. Defendant bears the burden to prove each element of the administrative and executive exemptions. *Walling,* 330 U.S. at 547–48, 67 S.Ct. at 883–84; *Corning Glass Works,* 417 U.S. at 196–97, 94 S.Ct. at 2229. Not only has defendant failed to prove each element, it has also failed to show the absence of genuine issues of material facts regarding both exemptions. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970). Similarly, plaintiffs have also failed to show the absence of genuine issues of material fact regarding their entitlement to overtime compensation for substantially interrupted meal periods.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Plaintiffs' motion for partial summary judgment is denied. Defendant's cross-motion for summary judgment is granted only insofar as plaintiffs are not entitled to overtime for their third-shift meal periods and is otherwise denied.

2. By January 12, 1998, the parties shall file a Joint Status Report proposing a deadline for discovery and a schedule for pretrial filings, the pretrial conference, and trial, not to exceed 5 days.

cising discretion and independent judgment of the level required for exemption.